IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARCELLEUS L. JACKSON, )  | |
| ) | CASE NO. 4:13-CV-929 |
| Plaintiff, ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KENNETH S. McHARGH |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | **MEMORANDUM OPINION &** |
| ) | **ORDER** |
| Defendant. ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 14). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Marcelleus Jackson's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

### I.  PROCEDURAL HISTORY & PERSONAL BACKGROUND

Plaintiff Marcelleus Jackson ("Plaintiff" or "Jackson") filed applications for Supplemental Security Income benefits and Disability Insurance benefits on December 17, 2009. (Tr. 113-20). Jackson alleged he became disabled on May 1, 2008 due to a heart condition and high blood pressure. (Tr. 182). The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 61-66, 70-75).

1

At Jackson's request, administrative law judge ("ALJ") Stewart Goldstein convened an administrative hearing on September 19, 2011 to evaluate his applications. (Tr. 24-54).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), William Reed, also appeared and testified. (*Id.*).  On October 19, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 10-17).  After applying the five-step sequential analysis,[1] the ALJ determined Jackson retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 6).  The Appeals Council denied the request for review, making the ALJ's September 19, 2011 determination the final decision of the

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Jackson was born on November 21, 1970, and was 40-years-old on the date the ALJ rendered his decision. (Tr. 31). Accordingly, at all relevant times, he was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). Plaintiff completed high school and truck driving school. (Tr. 32-33). He has past relevant work as a truck driver, a school bus driver, and a warehouse worker. (Tr. 47).

## II. MEDICAL EVIDENCE[2]

Around the beginning of 2008, Stephen N. Crowe, M.D., diagnosed Jackson with obstructive sleep apnea and prescribed a continuous positive airway pressure ("CPAP") machine. (Tr. 377). One month later, Dr. Crowe switched Plaintiff to a bi-level positive airway pressure ("BiPAP") machine, due to side effects of dry mouth and difficulty exhaling. (Tr. 375).

On May 29, 2008, Jackson was admitted to St. Elizabeth Health Center after complaints of intermittent chest pain that occurred with light exertion and occasionally when at rest. (Tr. 306). On June 3, 2008, Robert Houston, M.D., diagnosed severe left ventricular dysfunction. (Tr. 298). The same day, Plaintiff underwent a left heart ventriculography. (Tr. 297-98). The visually estimated ejection fraction was 10 percent. (Tr. 298).

While Plaintiff was hospitalized, Mita Raheja, M.D., noted Plaintiff's complaints of shortness of breath, history of hypertension, alleged history of syncope, and cigarette and alcohol use. (Tr. 286). Dr. Raheja reported that Plaintiff's echocardiogram showed left ventricular dysfunction and a left ventricular ejection fraction of 25 to 30 percent. (*Id.*). He opined that Plaintiff's history was suggestive of progressive cardiomyopathy either related to longstanding

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record.

hypertension and sleep apnea or underlying coronary artery disease. (Tr. 287). The doctor recommended optimization of medications and treatment of heart failure, and considered an implantable cardioverter difibrillator ("ICD"). (Tr. 287).

On June 5, 2008, Jackson responded to treatment and was discharged in stable and improved condition. (Tr. 307). Upon discharge, Ned Underwood, D.O., diagnosed dilated cardiomyopathy, essential hypertension, and congestive heart failure. (*Id.*). David Belvedere, M.D., instructed Jackson not to return to his job as a truck driver unless his cardiac performance improved dramatically. (Tr. 328-29).

Dr. Underwood completed a questionnaire for the Social Security Administration describing Plaintiff's most recent care in May and June of 2008. (Tr. 312-14). Dr. Underwood indicated that he last treated Plaintiff on June 5, 2008. (Tr. 312). Jackson experienced chest discomfort and dyspnea while performing activities like walking a block. (Tr. 313). The doctor noted Plaintiff's most recent ejection fraction was less than 20 percent. He also indicated that Jackson was "currently compensated." (*Id.*). Dr. Underwood opined that the intensity and persistence of the symptoms or pain mentioned in his report were customarily associated with the degree of physical findings described. (Tr. 314).

On June 19, 2008, Dr. Houston evaluated Jackson, who reported that he felt "significantly improved" since his hospitalization and experienced only mild episodes of dyspnea. (Tr. 326). On examination Dr. Houston noted "[q]uestionable third and fourth heart sounds" and an "[a]typical Grade I/VI ejection murmur." (*Id.*).

In August 2008, Jackson indicated to Dr. Raheja that he was feeling well and denied shortness of breath or chest pain. (Tr. 332). The doctor noted a history of severe left ventricular dysfunction and symptoms of congestive heart failure in June 2008. Dr. Raheja assessed that

Plaintiff's cardiac status was improved, and he was free of symptoms of heart failure. The doctor encouraged Plaintiff to abstain from alcohol, which he still used on occasion, and to consistently comply with his sleep apnea treatment. (*Id.*).

On September 11, 2008, state agency reviewing consultant Lynne Torello, M.D., reviewed the record and opined that Jackson could perform light exertional work with no concentrated exposure to extreme cold and heat. (Tr. 336-343). Additionally, she found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 338).

Jackson returned to Dr. Houston in November 2008 and reported improved exercise function. (Tr. 348). Though he experienced occasional dyspnea, Plaintiff was able to go about his activities of daily living without any limiting symptoms. (*Id.*). Upon examination, Dr. Houston noted a fourth heart sound and a Grade I/VI ejection murmur. An electrocardiogram ("EKG") showed sinus rhythm with atrial abnormality and nonspecific poor anterior R-wave progression. Dr. Houston increased Jackson's prescription of Coreg. (Tr. 349).

In January 2009, Jackson presented to David Belvedere, M.D., stating that he felt well in general, but had not been compliant with using his CPAP machine. (Tr. 514). His ejection fraction was estimated on January 26, 2009 as being at 31 percent. (*Id.*). Another January 2009 reported noted that Jackson's left ventricular systolic function was moderately impaired with an ejection fraction between 30 and 40 percent. (Tr. 515).

On March 2, 2009, Plaintiff reported feeling better and denied chest pain or shortness of breath. (Tr. 533). He did not experience dyspnea, though he had not been using his CPAP regularly. (*Id.*). Dr. Raheja opined that Jackson's left ventricular function had improved secondary to medical therapy and encouraged regular use of the CPAP. (*Id.*). By May 2009, imaging showed Jackson had diffuse left ventricle hypokinesis with an ejection fraction of 38.7

5

percent. (Tr. 513). Dr. Houston opined that the imagining confirmed significant improvement in left ventricle function and it did not appear that an ICD placement was required. (*Id.*).

On January 20, 2010, Plaintiff told Dr. Raheja that he was regularly taking his medications and using his CPAP. (Tr. 530). He reported no symptoms and that he could perform his physical activity without difficulty. (*Id.*). Dr. Raheja opined that Jackson's "left ventricular function had improved considerably on medication therapy and with regular use of a CPAP." A recent scan showed a left ventricular ejection fraction of 38 to 40 percent. (*Id.*). Dr. Raheja opined that Plaintiff could "resume full activity as well as resume working." (*Id.*).

On March 2, 2010, George Aromatorio, M.D., opined that Jackson was "doing clinically well." (Tr. 543-44). Dr. Aromatorio reported that Jackson's ejection fracture improved to the point that an ICD was not required, and he had "markedly improved symptomatically with medical therapy." (Tr. 543). Jackson reported no symptoms. (*Id.*).

On March 15, 2010, state agency medical consultant Leslie Green, M.D., reviewed the updated record and opined that Jackson was restricted to light work. (Tr. 547-54). He could not climb ladders, ropes, or scaffolds, or be exposed to extreme heat, cold, or hazards. (Tr. 549-51).

On June 23, 2010, Jackson presented to St. Elizabeth Hospital emergency room after a fainting episode. (Tr. 565). Plaintiff had been moving a heavy box of books when he felt pressure in his chest and passed out. (*Id.*). Keith Henson, D.O., noted an electrocardiogram revealed atrial fibrillation. (Tr. 569). Jackson was admitted for cardiac evaluation. (*Id.*).

During Jackson's hospitalization, Dr. Raheja observed that Jackson had made marked improvement of his left ventricle function, but over the last few months, Jackson was "lackadaisical about his medical care." (Tr. 625). More specifically, Plaintiff had not been using his CPAP and was not taking his medication regularly. (*Id.*). Dr. Raheja recommended

6

considering an ICD implant if left ventricle function was persistent or worse, especially because Jackson had not been using his BiPAP/CPAP. (*Id.*). On June 25, 2010, Dr. Houston opined that Jackson's ejection fraction was estimated at 25 to 35 percent. (Tr. 580). He noted that there was moderate to severe global hypokinesis of the left ventricle. (*Id.*).

On June 28, 2010, Dr. Raheja implanted a single chamber pacer ICD. (Tr. 628-29). Jackson was discharged on July 1, 2010 in stable condition. (Tr. 565). Dr. Henson diagnosed syncope due to cardiac arrhythmia, atrial fibrillation, ischemic cardiomyopathy, pulmonary hypertension, and sleep apnea. (*Id.*). Upon release, Dr. Raheja restricted Plaintiff from heavy lifting, pushing and pulling, working, and driving for one month. (Tr. 596).

On August 5, 2010, Jackson reported chronic exertional dyspnea to Dr. Houston. (Tr. 605). The shortness of breath occurred mostly with activities, such as climbing a flight of stairs. Plaintiff did not have resting symptoms, but descried an episode of a "jolt" several weeks prior. (*Id.*). Dr. Houston could not ascertain whether the jolt was the ICD implant discharging, but concluded Plaintiff was "stable" and instructed him to follow-up with Dr. Raheja. (Tr. 605-06).

On August 24, 2010, state agency physician L. Thomas, M.D. conducted a review of the updated medical record and affirmed Dr. Green's assessment. (Tr. 600).

In February 2011, Jackson returned to Dr. Houston, reporting shortness of breath with moderate activity. (Tr. 651). Plaintiff was not experiencing chest pain. (*Id.*). On March 18, 2011, Dr. Raheja performed defibrillation threshold testing. (Tr. 630). The doctor recounted that Plaintiff "continued to stay on his regular medications and ha[d] done well over the last 6 months." (*Id.*). On May 3, 2011, Dr. Raheja observed Jackson's ICD function was appropriate and there were no episodes detected. (Tr. 632). Dr. Raheja noted that Jackson had a history of

non-compliance CPAP machine use. (*Id.*).  Treatment notes from May 2011 showed that Jackson was feeling well and breathing well, and in June 2011, Jackson reported feeling better. (Tr. 637).

### III.  SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since May 1, 2008, the alleged onset date.

3. The claimant has the following severe impairments: Non-ischemic Cardiomyopathy; Atrial Fibrillation; Obesity; Hypertension; Diabetes Mellitus; Diet Controlled; and Sleep Apnea.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he cannot climb ladders, ropes, or scaffolds, but he can climb stairs and ramps occasionally, but not when carrying more than 10 pounds; he cannot have concentrated exposure to extreme heat/cold and cannot work around hazards (dangerous moving machinery, unprotected heights, commercial driving).

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on November 21, 1970 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2008, through the date of this decision.

(Tr. 12-17) (internal citations omitted).

8

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 Fed. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it

may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

### VI.  ANALYSIS

### A.  Whether substantial evidence supports the ALJ's step three finding and residual functional capacity determination

Plaintiff argues that the ALJ's finding at step three of the sequential evaluation is flawed, because it relied on state agency consultants' opinions that had not reviewed the entire record. Plaintiff maintains that in June 2010 his heart condition significantly deteriorated, and asserts that as a result of this decline, the state agency opinions were insufficient to support the ALJ's determination that he did not meet or medically equal Listing 4.02.  Jackson purports that the ALJ ought to have further developed the record.

To support his arguments, Plaintiff relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008), which states,

> As a general rule, when a transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

*Id.*  In *Deskin* the ALJ assessed the claimant's RFC largely based on his own analysis of the medical records. *Id.* at 910-11.  The record contained no opinion from a treating source.  The only medical opinion as to the claimant's abilities to perform work-related tasks was one prepared by a state agency reviewing physician, whose review had not included two years of relevant medical evidence. *Id.* at 910.  Moreover, the ALJ had failed to even incorporate all of the restrictions recommended by the state agency physician into the RFC. *Id.* at 912-13.  The court explained that "[a]n ALJ is not qualified to assess a claimant's RFC on the basis of bare

10

medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Id.* at 912 (*quoting Rohrberg v. Apfel*, 26 F. Supp. 2d 303 (D. Mass. 1998)). The court did not address the issue of medical equivalence at step three of the sequential evaluation.

As a preliminary matter, a claimant's medical equivalence and RFC are ultimately for the ALJ to determine. *See* 20 C.F.R. §§ 404.1526(e), 416.926(e), 404.1545(a), 416.945(a). Additionally, *Deskin* "is not representative of the law established by the legislature, and [as] interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-CV-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (Nugent, J.).

Furthermore, in determining medical equivalence, Social Security Ruling 96-6p, advises:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight.

Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 at *3 (July 2, 1996). The signature of a state agency medical consultant on a Disability Determination and Transmittal Form ensures that consideration by a physician designated by the Commissioner has been given to the issue of medical equivalency at the initial and reconsideration levels of administrative review. *Id.* Additional medical expert evidence is required under two circumstances, both of which are discretionary:

> 1. "When no additional medical evidence is received, but in the opinion of the administrative law judge . . . the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable;" or
>
> 2. "When additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."

11

SSR 96-6p, 1996 WL 374180, at *4.   The second circumstance is relevant to the present case.

Here, signatures of state agency examining physicians appear on the Disability Determination and Transmittal Forms at the initial and reconsideration levels. (Tr. 55, 60).  At the reconsideration level, Dr. Thomas's signature is dated August 24, 2010. (Tr. 60).  In accordance with the ruling, such signatures establish that a medical expert addressed the issue of equivalency.  Plaintiff contends that the only medical consultants' opinions in the record were rendered in September 2008 and March 2010, both prior to Jackson's June 2010 hospitalization.  Jackson overlooks the third state agency review from August 24, 2010.  Accordingly, Plaintiff is incorrect in asserting that there is no medical opinion evidence opining as to the issue of equivalence after his second hospitalization.

Though Plaintiff points to medical evidence that developed after August 2010, the date of the final state agency review which the ALJ relied upon, he has not shown that the ALJ believed the new evidence may have altered the state agency equivalency findings.  A review of the ALJ's opinion leads to the opposite conclusion.

At step three, the ALJ observed that the state agency consulting physicians had considered the issue of equivalency at the initial and reconsideration levels of administrative review. (Tr. 13).  The ALJ concurred with their opinions that Jackson did not meet or medically equal the listing. (*Id.*).  As reflected on the Disability Determination and Transmittal Form, Dr. Thomas conducted his review approximately two months after Plaintiff's ICD implant in June 2010.  The ALJ made no indication that he believed the opinion might have been impacted by the subsequent evidence.  The additional evidence appears to cover less than a one year period, and treatment notes from Plaintiff's cardiologists reflect that Jackson showed some improvement after the ICD implant and with medication compliance. (See, e.g., Tr. 630, 632, 637).

The remainder of the ALJ's opinion also supports the conclusion that the ALJ would not have believed that an updated medical opinion was necessary. When forming the RFC, the ALJ consulted the state agency opinions once again. (Tr. 15). At this step in the disability determination, the ALJ gave the opinions "less weight" as to Plaintiff's condition after June 2010, because additional evidence demonstrated Plaintiff's heart condition had worsened. (*Id.*). The ALJ expressly voiced his disagreement with the state agency physicians' opinions that Plaintiff could perform light work, including the opinion of Dr. Thomas, which the ALJ noted affirmed Dr. Green's March 2010 review. (*Id.*). In contrast, during the listing analysis, the ALJ never questioned the state agency physicians' equivalency finding, even though the RFC analysis shows that the ALJ was well aware of the post-dated evidence. Had the ALJ disagreed with the opinions or felt that additional evidence may have impacted the state agency reviewers' equivalency finding, the ALJ would have expressly done so in his step three analysis, as he did when formulating the RFC.

Substantial evidence supports the ALJ's step three conclusion as to Listing 4.02. In determining medical equivalence, it is proper for an ALJ to rely upon a state agency medical consultant's opinion that a claimant's impairment(s) does not meet a Listing. SSR 96-6p, 1996 WL 374180, * 3 (July 2, 1996). Here, the ALJ relied on the opinions of the state agency examiners in formulating the RFC. (Tr. 13). The ALJ also noted that Jackson's treating and examining physicians had not indicated findings that would satisfy the severity of the listing. (*Id.*). While Plaintiff points to symptoms such as fatigue, dyspnea, and chest discomfort following his second hospitalization, he does not explain how these symptoms equated to the requirements of Listing 4.02. Accordingly, Plaintiff's argument is not well taken.

In a related argument, Plaintiff asserts that the ALJ's residual functional capacity ("RFC") analysis suffers from the same flaw. That is, Jackson states that the ALJ ought to have obtained updated medical opinion evidence in order to formulate the RFC, and remand for further development of the record is necessary.

As to the RFC analysis, Plaintiff's argument also lacks merit. Although the ALJ has a duty to ensure that a reasonable record has been developed, *see Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986), it is incumbent upon the claimant to provide an adequate record upon which the ALJ can make an informed decision regarding disability, *see Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Furthermore, under the regulations, "the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-CV-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (*citing Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 WL 374183 (1996); SSR 96-8p, 1996 WL 374184 (1996)).

The ALJ sufficiently considered the record as a whole when formulating the RFC. Unlike *Deskin*, the ALJ assigned significant weight to the opinion of the state agency consultants as to Plaintiff's condition before June 2010, fully incorporating the recommended limitations in the RFC. (Tr. 15). The ALJ's RFC varied from the state agency opinions only in that the ALJ found Plaintiff more restricted in his abilities; the ALJ concluded that Plaintiff could perform sedentary, rather than light work. (*Id.*). Additionally, the ALJ expressly discussed an opinion from Dr. Raheja, one of Plaintiff's treating sources, who opined in January 2010 that Plaintiff could resume full activity following his first hospitalization. (Tr. 15).

Furthermore, the ALJ addressed the evidence that arose around and after the final state agency review was rendered in August 2010. The ALJ discussed the June 2010 hospitalization, which Dr. Raheja's notes indicated was engendered, at least in part, by noncompliance. (Tr. 14). Jackson reported exertional dyspnea with moderate activities, like climbing a flight of stairs, soon after his second hospitalization. (Tr. 14-15). However, the ALJ pointed out that in March 2011, Plaintiff was doing well, and by May 2011, Plaintiff was breathing well. (Tr. 15). In contrast to *Deskin*, less than one year of medical evidence followed the final state agency review of Jackson's medical records.

What is more, only certain conditions trigger an ALJ's duty to obtain additional medical opinion evidence. Social Security Ruling 96-5p states the circumstances under which an ALJ must recontact a claimant's treating source. SSR 96-5p, 1996 WL 374183, at *6 (1996). Two conditions must be met. First, the evidence must not support the treating source's opinion. Second, the ALJ must be unable to ascertain the basis of the physician's opinion from the record. *Id.*; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010) ("An ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician.") (*quoting Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156, n. 3 (6th Cir. 2009)).

Jackson has not demonstrated that the ALJ's duty was triggered in this case. Plaintiff does not contest that Dr. Raheja's opinion was unsupported or that the basis of the opinion was unclear. The doctor's opinion that Plaintiff could resume full activity following his first hospitalization was based partly on Plaintiff's marked improvement in heart condition facilitated by treatment. (Tr. 14). When Plaintiff was discharged from his second hospitalizations on July

15

1, 2010, Dr. Raheja imposed heavy lifting, pushing, pulling, working, and driving restrictions. (Tr. 596). Nonetheless, these restrictions were to last only one month. (*Id.*). Plaintiff does not question Dr. Raheja's recommendations.

Regarding consultative examinations, an ALJ is required to refer a claimant for such examinations only when the record establishes that it "is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (*quoting Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). Additionally, "it is within the ALJ's discretion whether to consult a medical expert at a claimant's hearing." *Harris v. Astrue*, No. 1:11-CV-2785, 2012 WL 3656402, at *9 (N.D. Ohio Aug. 23, 2012) (*citing* 20 C.F.R. § 404.1529(b)).

In the present case, Plaintiff has not demonstrated that it was necessary for the ALJ to obtain a consultative examination or that the ALJ abused his discretion in declining to call on a medical expert. The ALJ weighed the medical opinion evidence of record, which included an assessment of Plaintiff's medical records spanning until approximately August 2010, against other evidence such as Plaintiff's statements as to his symptoms and limitations and course of treatment. Thereafter, the ALJ reasonably formulated the RFC. Accordingly, this assignment of error is not well taken.

### B. Whether substantial evidence supports the ALJ's finding at step five

At the fifth step of the sequential analysis, the Commissioner carries the burden to prove the existence of a significant number of jobs in the national economy that an individual with the claimant's limitations can perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the ability perform specific jobs. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x

16

794, 799 (6th Cir. 2004) (*quoting Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only when the question accurately portrays the claimant's individual impairments. *Davis v. Sec'y Health & Human Servs.*, 915 F.2d 186 (6th Cir. 1990) (*quoting Varley,* 820 F.2d at 779)). The Sixth Circuit has further clarified the ALJ's duty at step five, explaining:

> "The rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Redfield v. Comm'r of Soc. Sec.*, 366 F.Supp.2d 489, 497 (E.D. Mich. 2005). In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993). An ALJ is not required to accept a claimant's subjective complaints, and "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

*Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).

Here, Plaintiff asserts that the controlling hypothetical question was incomplete, and should have included the following terms: that Jackson would be off-task 20 percent of each day and would require two to three unscheduled daily breaks lasting 15 to 30 minutes. In support of this argument, Plaintiff points to the administrative hearing during which he testified that he experienced chronic significant fatigue, which caused him to fall asleep two to three times each day for 15 to 30 minutes at a time. (Tr. 44). Jackson notes that the ALJ found him "generally credible," and the decision contains no reasons why the ALJ discounted his complaints. Plaintiff adds that Dr. Underwood verified that his symptoms were credible. (Tr. 313-14).

Plaintiff's arguments are not well taken. The ALJ concluded that Jackson was only "generally credible," which distinct from a finding that Jackson was "fully credible." (Tr. 15). The ALJ's opinion contains reasons to support his decision not to credit Jackson's reports in

17

their entirety. (*Id.*). The ALJ observed that "the progression of the medical evidence showed [Plaintiff] recovered well within 12 months of his initial episode to at least the RFC level by August 19, 2009 and was fully functional by January 20, 2010 when his doctor said he could resume fully activity." (*Id.*). The ALJ indicated that Jackson was not fully compliant with treatment, particularly with the use of his CPAP machine, which healthcare providers often commented on in treatment notes. (*Id.*). The ALJ also discussed medical records from 2011 which indicated some improvement in Jackson's condition following the second hospitalization. (*Id.*). The ALJ reasonably found Plaintiff was not fully credible and was not obligated to incorporate the limitations Plaintiff points to.

Additionally, Plaintiff's reliance upon Dr. Underwood's opinion is not well-founded because the doctor did not recommend rest breaks or indicate that Plaintiff would be off-task. Jackson does not provide any proof demonstrating that Dr. Underwood's report intended to convey the limitations at issue. As a result, the ALJ was not required to include Plaintiff's unsubstantiated claims in his hypothetical question presented to the VE, or to rely upon the VE's testimony presented in response to the hypothetical question which included such claims. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994).

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh  
Kenneth S. McHargh  
United States Magistrate Judge

Date: <u>May 30, 2014.</u>